UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| SOLANYI G.,<br><br>Plaintiff,<br><br>v.<br><br>FRANK BISIGNANO, Commissioner of the Social Security Administration,<br><br>Defendant. | **REPORT AND RECOMMENDATION TO AFFIRM THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS**<br><br>Case No. 2:25-cv-00085<br><br>District Judge Tena Campbell<br><br>Magistrate Judge Daphne A. Oberg |

Solanyi G.[1] brought this action for judicial review of the denial of her applications for disability insurance benefits and supplemental security income.[2] The Administrative Law Judge (ALJ) who addressed Ms. G.'s applications determined she did not qualify as disabled.[3] Ms. G. claims error relating to the ALJ's assessment of her subjective symptoms and her residual functional capacity.[4] Because the ALJ applied the correct legal standards and substantial evidence supports his findings, the undersigned[5] recommends the district judge affirm the Commissioner's decision.

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in court orders in certain cases, including social security cases, the court refers to the plaintiff by first name and last initial only.

[2] (*See* Compl., Doc. No. 1.)

[3] (Certified Tr. of Admin. R. (Tr.) 53–68, Doc. No. 25.)

[4] (See Opening Br. 9, Doc. No. 33.)

[5] This case is referred to the undersigned magistrate judge under 28 U.S.C. § 636(b)(1)(B). (Doc. No. 9.)

## STANDARD OF REVIEW

Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code provide for judicial review of the Commissioner's final decision. This court reviews the ALJ's decision to determine whether substantial evidence supports his factual findings and whether he applied the correct legal standards.[6] "[F]ailure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal."[7]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[8] Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is "more than a mere scintilla."[9] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10] "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."[11] And the court may not reweigh the evidence nor substitute its judgment for that of the ALJ.[12]

---

[6] *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation omitted).

[8] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[9] *Id.* at 103 (citation omitted).

[10] *Id.* (citation omitted).

[11] *Lax*, 489 F.3d at 1084 (citation omitted).

[12] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

## APPLICABLE LAW

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[13] An individual is considered disabled only if her impairments are so severe, she cannot perform her past work or "any other kind of substantial gainful work."[14]

In determining whether a claimant qualifies as disabled, the ALJ uses a five-step sequential evaluation, considering whether:

1) the claimant is engaged in substantial gainful activity;
2) she has a severe medically determinable physical or mental impairment;
3) the impairment is equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation);
4) she has the residual functional capacity to perform past relevant work; and
5) she has the residual functional capacity to perform other work, considering her age, education, and work experience.[15]

[13] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[14] *Id.* §§ 423(d)(2)(A), 1382c(a)(3)(B).

[15] *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Williams v. Bowen*, 844 F.2d 748, 750–51 (10th Cir. 1988).

In the first four steps, the claimant has the burden of establishing disability.[16] And at step five, the Commissioner must show the claimant retains the ability to perform other work in the national economy.[17]

**PROCEDURAL HISTORY**

Ms. G. applied for disability insurance benefits and supplemental security income.[18] After an administrative hearing,[19] the ALJ issued a decision, finding Ms. G. not disabled and denying benefits.[20]

At step two of the sequential evaluation, the ALJ found Ms. G. had the severe impairments of "partial thickness tear of the right rotator cuff/tendinosis; obesity; right knee osteoarthritis; type II diabetes mellitus; migraine headaches; fibromyalgia/chronic pain syndrome; carpal tunnel syndrome; depression; and anxiety."[21] The ALJ determined Ms. G. also had nonsevere impairments of asthma, hypertension, chronic venous insufficiency, gastroesophageal reflux disease, and degenerative disc disease of the cervical spine.[22] At step three, the ALJ concluded Ms. G.'s impairments did not meet or medically equal an impairment listing.[23]

---

[16] *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).

[17] *Id.*

[18] (*See* Tr. 485–520.)

[19] (Tr. 75–109.)

[20] (Tr. 53–68.)

[21] (Tr. 56.)

[22] (*Id.*)

[23] (Tr. 56–59.)

The ALJ then found Ms. G. had the residual functional capacity to perform "light work" with certain limitations:

> [S]he can occasionally climb ramps and stairs; she can never climb ladders, ropes, and scaffolds; she can frequently balance; she can occasionally stoop, kneel, crouch, and crawl; she can occasionally reach overhead bilaterally; she can frequently handle and finger bilaterally; she can never be exposed to hazards such as unrestricted heights and dangerous moving machinery; she can occasionally be exposed to vibration and pulmonary irritants; she can be exposed to moderate noise as defined in the SCO; due to physical pain, she is limited to simple work; due to mental limits, she can perform simple, goal-oriented but not assembly line paced work; she can occasionally interact with co-workers, supervisors, and the general public; and she can adapt to routine changes at the workplace.[24]

At step four, the ALJ found Ms. G. had no past relevant work.[25] But at step five, based on her residual functional capacity and the testimony of a vocational expert, the ALJ found Ms. G. capable of other jobs in the national economy.[26] Accordingly, the ALJ found Ms. G. not disabled and denied her claims.[27] This decision became final when the Appeals Council denied Ms. G.'s request for review.[28]

## ANALYSIS

Ms. G. raises two claims of error relating to the residual functional capacity (RFC) determination. First, she contends the ALJ failed to evaluate nonmedical evidence in assessing her subjective symptoms.[29] Second, she argues the ALJ failed to account for

[24] (Tr. 59.)

[25] (Tr. 66.)

[26] (Tr. 67.)

[27] (Tr. 67–68.)

[28] (Tr. 5–7.)

[29] (Opening Br. 10–16, Doc. No. 33.)

all symptoms and limitations resulting from her migraine headaches in the RFC.[30] As explained below, Ms. G. has demonstrated no error.

A claimant's RFC is the most she can do in a work setting considering her limitations.[31] In assessing RFC, the ALJ considers "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."[32] The ALJ considers all relevant medical and other evidence in the record.[33]

A. <u>Subjective Symptoms</u>

Ms. G. contends the ALJ did not adequately explain how he evaluated her subjective symptoms.[34] She argues he focused strictly on medical evidence without evaluating other factors.[35] And she contends the ALJ improperly rejected fibromyalgia-related symptoms based solely on "normal" objective test results.[36]

---

[30] (*Id.* at 17–23.)

[31] *See* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); SSR 96-8p, 1996 SSR LEXIS 5, at *1–2 (July 2, 1996).

[32] SSR 96-8p, 1996 SSR LEXIS 5, at *5.

[33] *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

[34] (Opening Br. 11–12, Doc. No. 33.)

[35] (*Id.*)

[36] (*Id.* at 14–16.)

1. *Applicable Law*

The governing regulations and agency guidance require ALJs to evaluate a claimant's subjective symptoms using a two-step process.[37] First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain."[38] Second, the ALJ must "evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."[39] In doing so, the ALJ "examine[s] the entire case record."[40] The ALJ considers factors such as: the claimant's daily activities; the duration, frequency, and intensity of pain or other symptoms; medication taken and whether it alleviates the symptoms; and other treatment or measures used to relieve the

[37] *See* SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016); 20 C.F.R. §§ 404.1529, 416.929. Ms. G. also relies on the Tenth Circuit's three-step framework for considering a claimant's subjective pain. *See Luna v. Bowen*, 834 F.2d 161, 163–64 (10th Cir. 1987); *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166–67 (10th Cir. 2012) (describing the *Luna* framework). But as she acknowledges, (*see* Opening Br. 10, Doc. No. 33), the two-step analysis under SSR 16-3p comports with *Luna*'s three-step process. *See Paulek v. Colvin*, 662 F. App'x 588, 593–94 (10th Cir. 2016) (unpublished) (finding a subjective symptom evaluation comported with *Luna* where the ALJ considered "the degree to which [the claimant's] subjective claims were consistent with the medical evidence" under SSR 16-3p); *John A.S. v. Bisignano*, No. 25-cv-00030, 2025 U.S. Dist. LEXIS 223111, at *6 n.7 (N.D. Okla. Nov. 13, 2025) (unpublished) ("The two-step analysis under SSR 16-3p, 2016 SSR LEXIS 4 comports with [the] prior, three-step process under *Luna*."). Accordingly, Ms. G.'s arguments are considered under the two-step framework.

[38] SSR 16-3p, 2016 SSR LEXIS 4, at *3 (Mar. 16, 2016); *see also* 20 C.F.R. §§ 404.1529(b), 416.929(b).

[39] SSR 16-3p, 2016 SSR LEXIS 4, at *4; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).

[40] SSR 16-3p, 2016 SSR LEXIS 4, at *9–10; *see also* 20 C.F.R. §§ 404.1529(c), 416.929(c).

symptoms.[41] The ALJ also considers any inconsistencies between the claimant's statements and the rest of the evidence, including the claimant's history, medical signs and laboratory findings, and statements by medical sources and others.[42]

2. *ALJ's Decision*

In assessing Ms. G.'s RFC, the ALJ noted she alleged disability due to "osteoarthritis, migraines, hand pain and dysfunction, difficulty with walking, knee and hip pain, back pain, fibromyalgia, visual impairment, depression and anxiety."[43] He summarized Ms. G.'s testimony regarding her symptoms and limitations as follows:

> [S]he testified that she is able to comfortably lift only 2–3 pounds. She stated that she could stand or walk for only about 15 minutes at one time and could sit for only about 20 minutes at a time. She testified that driving is difficult on her body. She also stated that while she shops for groceries about twice per month, she has difficulty walking in the store. She endorsed difficulty with memory and indicated that her daughter has to give her constant reminders. She stated that she cannot follow a television show, but if it is in Spanish, she can follow 50% of it. She stated that she experiences 2-3 migraine headaches per month that are so severe that they require her to lie down in a dark room. She stated that she needs to elevate her legs during the day for around 20 minutes at a time due to vascular insufficiency. She stated that she is able to perform only 50% of her personal needs and grooming, such as getting dressed, grooming, and showering. She stated that she can wash some dishes, but not much. She stated that she can do the laundry 50% of the time. She stated that she does not cook. She stated that she enjoys reading, but it is very difficult because of her eyesight.[44]

---

[41] SSR 16-3p, 2016 SSR LEXIS 4, at *18–19; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

[42] 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).

[43] (Tr. 59.)

[44] (Tr. 60.)

Applying the agency's two-step framework, the ALJ found Ms. G.'s medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.[45]

With respect to fibromyalgia, the ALJ acknowledged Ms. G. had been diagnosed with "fibromyalgia/chronic pain syndrome" with "associated symptoms of pain in multiple areas (back, bilateral shoulders, elbow, wrist, hips, knees)."[46] He noted Ms. G. reported to the psychological consultative examiner that she needed her daughter's help to dress about three times per week due to pain, and she occasionally needed help bathing.[47] But the ALJ observed Ms. G. treated her chronic pain with prescription medications and physical therapy which were "helpful."[48] The ALJ then summarized the objective medical evidence:

> She has been noted to have giveaway weakness in all proximal muscle groups, due to pain; however, she has no true muscle weakness. She also has been observed upon physical examination to have generally normal range of motion. Upon physical examination in treatment notes, she has also exhibited normal strength throughout and her motor functioning and coordination are intact.[49]

---

[45] (*Id.*)

[46] (Tr. 61.)

[47] (*Id.*)

[48] (*Id.*)

[49] (*Id.* (citations omitted).)

The ALJ explained he accounted for Ms. G.'s fibromyalgia and chronic pain syndrome by limiting her to light work with additional limitations, including limiting her to simple work due to physical pain.[50] The ALJ found "[g]reater limitations than these due to her fibromyalgia/chronic pain syndrome[] are not supported by the overall evidence during the relevant period."[51]

The ALJ performed similar analyses for Ms. G.'s impairments relating to her right shoulder, knees, headaches, diabetes, hands, and mental impairments.[52] For each alleged impairment, the ALJ summarized the relevant medical records and explained the related limitations included in the RFC.[53] The ALJ also discussed Ms. G.'s activities of daily living in addressing her allegations of pain in her knees and hands. The ALJ noted, according to her own reports, she took fifteen-minute walks twice per week,

---

[50] (Tr. 61–62.) Specifically, the ALJ included the following limitations relating to fibromyalgia and chronic pain:

> [S]he can occasionally climb ramps and stairs; she can never climb ladders, ropes, and scaffolds; she can frequently balance; she can occasionally stoop, kneel, crouch, and crawl; she can occasionally reach overhead bilaterally; she can frequently handle and finger bilaterally; she can never be exposed to hazards such as unrestricted heights and dangerous moving machinery; she can occasionally be exposed to vibration and pulmonary irritants; and due to physical pain, she is limited to simple work.

(Tr. 62.)

[51] (Tr. 62.)

[52] (*See* Tr. 60–63.)

[53] (*See id.*)

cleaned "all day long," enjoyed crafting when her hands were not hurting, was able to feed herself, and drove two to three times per week.[54]

After evaluating the medical opinion evidence, the ALJ concluded the assessed RFC was "supported by the medical evidence of record."[55] The ALJ stated: "While there are exertional and non-exertional limitations, the intensity and persistence of symptoms as alleged by the claimant are not consistent with the medical record signs and laboratory findings, or the medical record as a whole."[56]

3. *Analysis*

Ms. G. first argues the ALJ failed to adequately explain his evaluation of her subjective symptoms.[57] Specifically, she contends the ALJ relied solely on "medical evidence" without considering other factors from SSR 16-3p, such as her daily activities, medication side effects, or "other non-medical evidence."[58] But contrary to her argument, the ALJ expressly discussed several SSR 16-3p factors, including her daily activities and the effectiveness of medication and other treatment.[59] As noted above, the ALJ noted Ms. G.'s activities—walking, cleaning, crafting, feeding herself, and

---

[54] (Tr. 61, 63.)

[55] (Tr. 66.)

[56] (*Id.*)

[57] (Opening Br. 11–12, Doc. No. 33.)

[58] (*Id.* at 11.)

[59] *See* SSR 16-3p, 2016 SSR LEXIS 4, at *18–19 (providing factors to consider in evaluating subjective symptoms include "[d]aily activities," the "type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms" and "[t]reatment, other than medication, an individual receives or has received for relief of pain or other symptoms").

driving—in addressing her allegations of knee and hand pain.[60] The ALJ also considered the effectiveness of medications, physical therapy, and other treatments in alleviating Ms. G.'s chronic pain.[61] While Ms. G. suggests the ALJ should have discussed medication side effects, she does not identify specific side effects he should have considered or cite record evidence of them.[62] Likewise, she does not explain what "other nonmedical evidence" the ALJ failed to consider.[63] The record shows the ALJ considered and discussed relevant factors from SSR 16-3p in addition to objective medical evidence.

Next, Ms. G. argues the ALJ improperly rejected fibromyalgia-related symptoms based solely on "normal" objective test results.[64] But it was not improper for the ALJ to consider objective evidence in evaluating the limiting effects of her fibromyalgia. As the Tenth Circuit has recognized, agency guidance "directs that objective evidence is

---

[60] (*See* Tr. 61, 63); *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18 (listing "[d]aily activities" as a factor to consider in evaluating a claimant's subjective symptoms).

[61] (*See* Tr. 61 (noting medical records showed prescription medications including Lyrica and Duloxetine were "helpful" for Ms. G.'s chronic pain and physical therapy was "helpful when she did it"); *id.* (noting Ms. G. treated knee pain with "injections, physical therapy, heat and cold therapy, prescription pain medication and a knee sleeve")); *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *19 (listing medication and other treatment as factors to consider in evaluating a claimant's subjective symptoms).

[62] *See* SSR 16-3p, 2016 SSR LEXIS 4, at *19 ("We will consider other evidence to evaluate only the factors that are relevant to assessing the intensity, persistence, and limiting effects of the individual's symptoms. If there is no information in the evidence of record regarding one of the factors, we will not discuss that specific factor in the determination or decision because it is not relevant to the case."); *see also Eateries, Inc. v. J. R. Simplot Co.*, 346 F.3d 1225, 1232 (10th Cir. 2003) (The court "need not sift through the record to find evidence to support a party's argument." (citation modified)).

[63] (Opening Br. 11, Doc. No. 33.)

[64] (*Id.* at 14–16.)

relevant to determining whether medically determinable fibromyalgia is disabling."[65] SSR 12-2p instructs that, to find a claimant with fibromyalgia disabled, the ALJ "must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the person's functional abilities that it precludes him or her from performing any substantial gainful activity."[66] Further,

> if objective medical evidence does not substantiate the person's statements about the intensity, persistence, and functionally limiting effects of symptoms, we consider all of the evidence in the case record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.[67]

This is precisely the analysis the ALJ undertook. The ALJ properly considered that although Ms. G. reported needing help with dressing and bathing, examination findings showed no true muscle weakness, normal range of motion, and normal strength and coordination.[68] And contrary to Ms. G.'s argument, the ALJ did not rely solely on objective evidence; he also considered her medical treatment, including her own reports that prescription medication and physical therapy helped treat her pain.[69]

---

[65] *Nielsen v. Comm'r, SSA*, No. 21-4136, 2022 U.S. App. LEXIS 30034, at *8 (10th Cir. Oct. 28, 2022) (unpublished) (citing SSR 12-2p, 2012 SSR LEXIS 1 (July 25, 2012)).

[66] SSR 12-2p, 2012 SSR LEXIS 1, at *2–3.

[67] *Id.* at *14.

[68] (*See* Tr. 61.)

[69] (*See id.*)

Accordingly, the ALJ did not err in considering objective evidence, among other evidence, in evaluating Ms. G.'s subjective symptoms related to fibromyalgia.[70]

Ms. G. also argues the ALJ failed to properly analyze other medical records documenting Ms. G.'s fibromyalgia flares, fatigue, joint pain, and weakness.[71] But the ALJ was not required to discuss every piece of evidence.[72] The evidence the ALJ cited, including examination findings and treatment records, is more than a "mere scintilla."[73] It qualifies as substantial evidence supporting his finding that Ms. G. was not as limited as she alleged. Ms. G.'s argument that some medical records support greater limitations amounts to an invitation to reweigh the evidence—which the court cannot do.[74]

For these reasons, Ms. G. has demonstrated no error in the ALJ's assessment of her subjective symptoms.

B. Migraine Headaches

Ms. G. next contends the RFC assessment fails to account for all symptoms and limitations resulting from her migraine headaches.[75] Specifically, she argues the ALJ

---

[70] *See Nielsen*, 2022 U.S. App. LEXIS 30034, at *8–9 (concluding an ALJ did not err in relying on a lack of objective findings in evaluating a claimant's limitations related to fibromyalgia); *Trujillo v. Comm'r, SSA*, 818 F. App'x 835, 844 (10th Cir. 2020) (unpublished) (rejecting the "assertion that it was 'improper' for the ALJ to rely on objective medical evidence" in assessing subjective symptoms relating to fibromyalgia);

[71] (Opening Br. 15, Doc. No. 33 (citing Tr. 769, 995–96, 1018, 1580).)

[72] *See Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996).

[73] *Biestek*, 587 U.S. at 103.

[74] *See Langley*, 373 F.3d at 1118.

[75] (Opening Br. 17, Doc. No. 33.)

should have included limitations such as time off task and absenteeism due to her migraines.[76] And she argues the ALJ mischaracterized the evidence of migraine frequency, pain severity, and the effectiveness of migraine treatment.[77]

The ALJ found Ms. G.'s migraine headaches to be a severe impairment, and he acknowledged her testimony that she experienced two to three migraine headaches per month that were "so severe that they require her to lie down in a dark room."[78] He summarized the medical evidence regarding her headaches as follows:

> [A]n MRI of her brain taken in July 2022 showed scattered supratentorial and infratentorial T2/FLAIR hyperintensities that were potentially the consequence of mild chronic microvascular ischemic changes in the setting of chronic migraine headaches. Treatment notes from July 2023 showed her to be experiencing migraine headaches 4 days out of the week. She also has had to receive Toradol injections of her headaches on several different occasions. Neurological treatment notes in November 2023 indicate she was experiencing headaches, on average, 5 days per week. However, the average reported pain was only 3-4 on a 0-10 pain scale. She was started on new migraine medications through neurology at that time and subsequent follow-up notes noted a significant decrease in the frequency of her headaches.[79]

The ALJ then explained that he accounted for her headaches in the RFC by "limiting her to never climbing ladders, ropes and scaffolds, never being exposed to hazards such as unrestricted heights and dangerous moving machinery, no more than occasionally being

[76] (*Id.* at 18.)

[77] (*Id.*)

[78] (Tr. 56, 60.)

[79] (Tr. 62 (citations omitted).)

exposed to vibration; and being exposed to no more than moderate noise."[80] But he found "[g]reater limitations than these due to headaches are not supported by the overall evidence during the relevant period."[81]

Ms. G. has demonstrated no error. As to frequency, Ms. G. challenges the ALJ's finding that there was a "significant decrease in the frequency of her headaches" after she started new migraine medications in November 2023.[82] She argues the records the ALJ cited do not show a decrease in frequency. But the records adequately support the ALJ's characterization. At the November 2023 appointment, Ms. G. reported "daily headaches (on average 5 days/week)" with "average pain" rated "3-4/10," in addition to "severe headaches" with pain of "8-9/10."[83] In support of his "decreased frequency" finding, the ALJ cited a February 2024 appointment record where Ms. G. reported "intermittent migraine [headaches]" during the previous two weeks.[84] She also reported that medication usually "help[ed] break through when they [were] persistent."[85] While somewhat unclear, the ALJ reasonably interpreted "intermittent" headaches (which medication helped) as representing a decrease in frequency from "daily" headaches. Where this interpretation was reasonable, Ms. G. has not shown he mischaracterized the evidence.

---

[80] (*Id.*)

[81] (*Id.*)

[82] (*Id.* (citing Tr. 1282 (hearing exhibit C9F/7), Tr. 1421 (hearing exhibit C10F/23)).)

[83] (Tr. 1056.)

[84] (Tr. 1282; 1421.) These appear to be duplicate records from the same appointment.

[85] (*Id.*)

As to pain severity, Ms. G. takes issue with the ALJ's statement that, although she reported experiencing headaches five days per week in November 2023, "the average reported pain was only a 3-4 on a 0-10 pain scale."[86] Ms. G. argues this is a mischaracterization because she also reported severe headaches with an intensity of 8–9/10.[87] But the ALJ's statement is not inaccurate; it is almost verbatim from the cited record. Moreover, the ALJ did not err in omitting Ms. G.'s report of more severe headaches, where the cited record did not indicate how frequently those occurred and the ALJ made clear he was referencing only Ms. G.'s "average" pain level.

Finally, Ms. G. argues other evidence in the record corroborates her testimony that she experienced two to three severe headaches per month requiring her to lie down in a dark room.[88] But she relies on some records from before her alleged disability onset date of June 30, 2023.[89] She also points to records documenting her reports of migraines four days per week or more in July 2023, and two to four days per week in August 2023.[90] But these records do not undermine the ALJ's findings: the ALJ acknowledged and cited July 2023 records documenting Ms. G.'s report of four migraines per week, but he found Ms. G. later experienced improvement with

[86] (Tr. 62 (citing Tr. 1056 (hearing exhibit C6F/10)).)

[87] (Opening Br. 19, Doc. No. 33.)

[88] (*Id.* at 20–21.)

[89] (*See id.* at 20 (citing Tr. 808, 810, 995–96, 1012 (records from 2020 and 2022)); *see also* Tr. 53 (noting Ms. G.'s alleged onset date of June 30, 2023).)

[90] (*See* Opening Br. 20–21, Doc. No. 33 (citing Tr. 1114, 1118, 1625, 1656).)

medication.[91] Ms. G. next relies on records documenting headaches in October, November, and December 2023, and March, April, and August 2024.[92] But none of those records document the frequency of her "severe" headaches (those requiring her to lie down in a dark room), nor do they show she experienced these headaches two to three days every month.[93] Indeed, where she previously reported four migraines per week, these later records tend to support to the ALJ's conclusion that her headaches became less frequent after November 2023.

In sum, the ALJ did not mischaracterize the evidence, and he reasonably concluded the evidence showed Ms. G.'s migraine headaches were not as limiting as she alleged. The evidence the ALJ relied on qualifies as substantial evidence supporting his findings. Accordingly, Ms. G. has shown no error in the ALJ's evaluation of her migraine headaches.

## RECOMMENDATION

Because the ALJ applied the correct legal standards and his RFC findings are supported by substantial evidence, the undersigned recommends the district judge affirm the Commissioner's decision. The parties have the right to object to this Report

[91] (*See* Tr. 62 (citing Tr. 734 (hearing exhibit C3F/31)).)

[92] (*See* Opening Br. 21–22, Doc. No. 33 (citing Tr. 1034, 1056, 1408–09, 1415, 1580, 1751, 1784).)

[93] (*See* Tr. 1034, 1056, 1408–09, 1415, 1580, 1751, 1784.)

and Recommendation within fourteen days, and failure to object may be considered a waiver of objections.[94]

DATED this 30th day of July, 2026.

BY THE COURT:

Daphne A. Oberg
United States Magistrate Judge

[94] *See* 28 U.S.C. § 636(b)(1); Fed R. Civ. P. 72(b).